## MISSOURI STATE LIFE INSURANCE COMPANY, Appellant, v. ELIJAH H. SALISBURY.

### Division Two, July 5, 1919.

1. **INSURANCE POLICY**: Acceptance. Inconclusive negotiations concerning an insurance policy, which contains a clause that the insurance shall not take effect until the first premium is paid and the policy delivered to and accepted by the insured during lifetime and in good health, do not constitute an insurance contract. The facts of this case are reviewed, and it is held that the policy tendered by the company was never unconditionally accepted during the good health of the insured, or that the company understood that the policy sent and received was accepted, or was acceptable except upon a condition which could not be met, and that therefore there was no completed contract.

2. ————: **Non-Payment of First Premium.** A stipulation in an insurance policy requiring the first premium to be paid in advance and during the good health of the insured as a condition upon which it is to take effect is enforcible, and if the first premium was neither paid nor tendered during the insured's good health the policy did not become effective, and there is no enforcible insurance contract.

3. ————: **Payment Recited in Policy.** The payment of the first premium, where the policy itself recites that such first premium was made, cannot be disputed for the purpose of invalidating the policy; but where the recital is that "the insurance is granted in consideration of the payment in advance" of a named sum of money, "being the premium for the first year's insurance under this policy," the recital is not a specific recital of payment, but a mere statement that the first payment shall be the consideration for the issuance of the policy.

Appeal from Sullivan Circuit Court—*Hon. Nat M. Shelton*, Judge.

REVERSED AND REMANDED (*with directions*).

*Jones, Hocker, Sullivan & Angert* and *Vincent L. Boisaubin* for appellant.

(1) The policy on the life of Alpha O. Salisbury was only conditionally delivered for the purpose of in-

spection and comparison, and therefore the contract was never completed. Rey v. Equitable Life Assur. Soc., 44 N. Y. 745; New v. Germania Fire Ins. Co., 171 Ind. 33; Amos-Richia v. Northwestern Mut. Life, 152 Fed. 192; Coffin v. New York Life Ins. Co., 127 Fed. 555; Gordon v. Prudential Ins. Co., 231 Pa. St. 404; Harnickell v. N. Y. Life Ins. Co., 111 N. Y. 390. (2) The application, which was a part of the policy, provided that the insurance applied for should not take effect unless the first premium was paid and the policy delivered to and accepted by the assured during her lifetime and good health. The delivery of the policy was therefore conditional and payment of the premium during good health was a condition precedent, which not being performed, the policy was never in force. Wallingford v. Home Mut. F. & M. Ins. Co., 30 Mo. 46; Yount v. Prudential Life Ins. Co., 179 S. W. 749; Bowen v. Mutual Life Ins. Co., 104 N. W. 1040; Ormond v. Assn., 96 N. C. 158; Amos-Richia v. Northwestern Mut. Life Ins. Co., 152 Fed. 192; Lyke v. Am. Nat. Ins. Co., 187 S. W. 265. (3) The policy contained no formal acknowledgment of receipt of the premium, and therefore the mere description of the amount and nature of the consideration contained in the consideration clause did not operate as an estoppel to prevent the company from denying that the policy was a completed contract. Dobyns v. Bay State Ben Assn., 144 Mo. 95; Bush v. Ins. Co., 35 N. J. L. 429; Dircks v. German Ins. Co., 34 Mo. App. 31; Lyke v. American Natl. Ins. Co., 187 S. W. 265; Amos-Richia v. Northwestern Mut. Life Ins. Co., 152 Fed. 195. (4) The premium was not paid or tendered during the good health of Mrs. Salisbury, and therefore the policy was not in force. Perry v. Security Life & Ins. Co., 150 N. C. 143; American Home Life Ins. Co. v. Melton, 144 S. W. 362; Kilcullen v. Metropolitan Life Ins. Co., 108 Mo. App. 61; Gordon v. Prudential Ins. Co., 231 Pa. St. 404; Harriman v. N. Y. Life Ins. Co., 43 Wash. 398; 5 Elliott on Contracts, sec. 4358.

*W. C. Irwin, J. W. Bingham* and *Higbee & Mills* for respondent.

(1) Mrs. Salisbury unconditionally accepted the policy in suit on December 23, 1914 and signed and mailed the receipt evidencing that fact to Carson. He received this and on December 28th wrote Salisbury, congratulating them on accepting the policy. The pencil writing on this receipt, "For Inspection only," was written thereon by Carson at a later date. Four witnesses testify it was not on the receipt while Salisbury had it. (2) The policy acknowledges the payment of the premium in advance. That fact may not be disproved to invalidate the policy. Dobyns v. Bay State Ben. Assn., 144 Mo. 95. (3) Carson was authorized to take application and deliver the policy. He expressly extended credit for the premium. He agreed to take Salisbury's note for the premium due in April, 1916, and that it might be paid out of commissions on insurance Salisbury might write. Prepayment was waived by unconditional delivery of the policy, and by refusal to accept payment when duly tendered. 25 Cyc. 726, (3); Halsey v. Ins. Co., 258 Mo. 659. (4) Carson was the agent, the *alter ego,* of the Company, and authorized to waive prepayment of the premium. R. S. 1909, sec. 6938; Madison v. Ins. Co., 180 S. W. 1169. (5) The policy was delivered and accepted and credit extended for the payment of the premium during good health. It was then in force. The answers that Salisbury had no other insurance and no other applications for insurance pending were made at the instance of Carson and furnish no ground to defeat payment of the policy. 25 Cyc. 800, D; Modern Woodmen v. Angle, 127 Mo. App. 95, 112; Ins. Co. v. Mullen, 197 Fed. 299. (6) The provision that premium must be paid and the policy delivered while insured is in good health is for the benefit of the insurer and may be waived. Bell v. Mo. Life Ins. Co., 166 Mo. App. 399. And once waived cannot be recalled. Ib. p. 402; Brix v. Fidelity Co., 171 Mo.

App. 518, 526.  Mrs. Salisbury's recovery was ex-
tremely probable, says the petition.  It further ap-
pears from the petition her gunshot wound was not the
cause of her death.  "She either fell or threw herself
to the ground."  If she "fell" then the condition of her
health is immaterial.  Coscarella v. Ins. Co., 175 Mo. App.
130, 136.  (7) The policy recites that it and the appli-
cation constitute the entire contract.  It was therefore
inadmissible to offer proof of a verbal agreement that
neither policy would be accepted unless both were issued.
Such a condition could be waived.

WHITE, C.—The plaintiff brought this suit for the
purpose of canceling a policy of insurance written by
the defendant upon the life of Alpha O. Salisbury, wife
of the defendant.  The petition alleged several reasons
why the policy should be canceled, and among them
those which are urged here and which we will consider:
First, that the policy was never delivered uncondition-
ally to the insured and there was no completed contract
upon which the minds of the parties met prior to the
death of Alpha O. Salisbury; and, second, that the first
premium was not paid during the good health of the
insured, as required by the terms of the policy.

The defendant filed an answer and counterclaim.
The counterclaim alleged the policy under consideration
insured the life of Alpha O. Salisbury, in the sum of
ten thousand dollars for the benefit of the defendant,
and that Alpha O. Salisbury died on the 10th day of
February, 1915, and prayed judgment for ten thousand
dollars.  The plaintiff replied to the counterclaim deny-
ing the execution and delivery of the policy sued on,
alleging its invalidity as a contract on account of the
same matters set up in the petition, and praying for its
cancellation, as prayed in the petition.

On a trial in the Circuit Court of Sullivan County
judgment was rendered against the plaintiff on its
petition, and for the defendant on his counterclaim for

ten thousand dollars and interest, less the amount of the first premium. The plaintiff appealed from that judgment.

The defendant Salisbury was a school teacher and at some time early in October, 1914, he and his wife Alpha decided that they would take out insurance, each in favor of the other. They went at the matter cautiously, desiring to secure the best possible contract, and let it be known to various insurance agents what they contemplated in that respect. The result was that they were solicited by various agents and sent in applications to a number of companies with the understanding that they should receive the policies for the purpose of inspection and after a comparison would make their selection. Salisbury testified, in speaking of the agents: "I told them I thought of taking out some insurance; that I thought I was able to carry it; that I had decided on buying it about the same as I would a horse; that is, to examine two or three good policies and decide which one I would take." It was his intention to take a policy out upon his own life and that of his wife in the same company; the one he should find to be satisfactory.

Pursuant to his applications several policies upon himself and his wife were issued and delivered to him for the purpose of inspection; among them was a policy of the American Central Life Insurance Company, and a policy of the Central Life Insurance Company of Illinois. The New York Life and the Iowa National Insurance Company also submitted policies for inspection. This occurred about the 20th of October, 1914.

Matters were in this posture when C. M. Carson, agent of the plaintiff, Missouri State Life Insurance Company, heard of the contest and desired to enter the competition for his company. Salisbury at first indicated that he had enough policies from which to make his selection, but finally consented to let Carson in on the competition. Applications for Salisbury and for his wife were filled out; his, it appears, was dated on the

22nd day of October, but that of his wife was dated the 28th of October. This is explained by both Salisbury and Carson to be on account of having to take the application to his wife and have her sign it in person, which was required by Mr. Carson; it caused a delay of a few days. There applications were sent in to the plaintiff. About the 14th of November a policy on the life of Mrs. Salisbury was sent to Carson somewhere in Illinois, and he in turn sent it to Salisbury about November 20th. On the application of Elijah Salisbury no policy was issued, because of an unfavorable result in the analysis of his urine. The matter was held up for further examination. It appears that his application was not definitely declined, but subsequently he was urged to submit to further examinations and undergo a special diet for the purpose of making a proper test. This delay and uncertainty in his application figured very materially in the subsequent negotiations between the parties.

On the 22nd of November Salisbury and his wife, having policies of the several insurance companies before them, went over the entire matter for the purpose of deciding the contest, and finally, on the 23rd of November, they decided to accept the policies of the Central Life Insurance Company of Illinois. In the meantime, however, Salisbury had so far committed himself with reference to the American Central that that company treated the policy as delivered and the contract as closed. It was said by respondent's counsel in oral argument before the court that each of these companies had recognized its liability and had paid ten thousand dollars on the life of Mrs. Salisbury.

On the 8th of December, Carson had a telephone conversation with Salisbury, telephoning from Quincy, Illinois. He testified that he then urged Salisbury to go before certain doctors whom he named for the purpose of further examination, and Salisbury promised to do so. Salisbury testified that he told Carson at that time he had not accepted the policy on his wife and that

Carson requested Salisbury to give him another chance and urged him to send another sample of urine for examination, which he agreed to do. Carson swore he had no conversation with Salisbury after the applications were received except the telephone conversation of December 8th, until January 14, 1915. Salisbury swore that he had two other conversations with Carson—one between November 23rd and December 8th, and the other between December 8 and December 23.

When the policy on the life of Mrs. Salisbury was sent to Salisbury on November 20th, Carson enclosed a receipt for her to sign. This receipt was retained by Salisbury until December 23rd, when he mailed it to Carson at St. Louis, with a letter. Several letters between the parties appear in the record.

On the 31st day of December Mrs. Salisbury was shot through the chest. All the evidence in relation to it indicates that the shooting was accidental. She died February 10th, following. There is some evidence tending to show that she improved for a while after she was wounded, and that her death was immediately caused by a fall from a window, while walking in her sleep, but while she was still suffering from her wound.

After Mrs. Salisbury was shot the only conversations between the principal witnesses, Carson and Salisbury, relate to an endeavor on the part of the company to recover the policy on her life which was in the possession of Salisbury. Carson was ordered to recover the policy and cancel it, and Salisbury, after putting him off with several excuses, finally refused to give it up. Salisbury and Carson agreed that they had a conference on January 14th, and again on January 21st or 27th, or probably on both of these dates. The letters mentioned and these various conversations will be considered more fully in discussing the question whether the minds of the parties met.

I. Appellant claims it was never the intention of Salisbury to accept the policy of his wife unless he

should also receive a policy on his own life; it was upon that condition that he received a policy for examination and such condition was never complied with. Also, a contemplated agency

*Conditional Acceptance.*

for the company on the part of Salisbury entered into the negotiations; it will be necessary to inquire how far his appointment as an agent was conditioned on his taking the policy. Mrs. Salisbury had nothing to do with any of the negotiations at any time, and all of the conversations and negotitations relating to the matter which took place were between Salisbury and Carson.

It is certain that in the beginning Salisbury had determined to take out only one policy on his own life and one on the life of his wife, both to be in one company. He began his investigations with that intention, and that was the understanding he had with all the agents, including Mr. Carson, agent for the plaintiff here. It remains to determine whether there was a change in that intention communicated to the plaintiff's agent.

It is certain that on November 23rd he accepted the policy of the Central Life of Illinois and never at any time rescinded or attempted to rescind that acceptance. There is no evidence in the record to show that he ever attempted to deny a completion of the contract with that company. He did have a dispute with the agent of the American Central and refused to accept the policy which had been delivered to him for inspection, when the agent threw it down on the table and said it was Salisbury's policy and walked out. Salisbury afterwards retained that policy, but whether he reconsidered his determination to decline it before his wife was shot is not shown. So he was bound by two policies of $10,000 each on the life of his wife before he claims to have accepted plaintiff's policy.

Carson swore positively that Salisbury "said he thought he and his wife would like to take ten thousand dollars each, but that he was not going to take ten thousand dollars on his wife unless he taken that much

on himself and he was not going to take that much on himself unless he taken the same amount on his wife, but that if I cared to take his application and submit it with the understanding that he would not have to take either policy, the one issued on his own life and the one issued on his wife's life, unless both his wife's policy and his policy were issued, or in other words he would not take either policy unless both were issued.''

Carson, on acknowledging the receipt of the application on October 28, wrote Salisbury calling attention to the desirability of an agency for Salisbury and said: ''Shall be pleased to go into that proposition with you when *your policies* are issued, and shall then bring them over myself and talk things over.''

Salisbury said his first interview with Carson was on the 20th of October; that with some reluctance, after Carson had urged the matter of agency on him, he finally, on the 22nd of October, decided to ''let him in on the contest as I had the others.'' In answer to the question, ''What was said about your wife's policy?'' he testified that there was some question about his insurability on account of a weak ankle and he said to Carson, ''Now, in case my application was turned down on that it would be a serious point against them because *I was not going to take the policies in two companies.*'' Salisbury again testified in speaking of the conversation he had with Carson between the 23rd of November and the 8th of December, that he told Carson if he decided to take his policy, ''that I was not going to consider writing insurance when I decided on the policy,'' definitely eliminating *at that time* all question of the agency as a part of the agreement.

In Salisbury's mind, his possession of the policy on the life of his wife was for inspection only, for in speaking of the telephone conversation of the 8th of December when Carson called him up from Quincy, Ill., he says: ''I told him [Carson] I had not accepted the policy, but that it was a pretty close decision between the Central Life and the Missouri State.'' Then he

added that Carson asked him to reconsider and give him another chance, and continued: "And I finally agreed to give him another chance, and he said for me to send another sample of urine to the home office, he wanted them to have another chance, they were holding it up on that account, and he told me they had requested several samples and none had come."

This indicates that in Salisbury.'s mind the two policies should go together in one company; that his own physical eligibility must first be determined and his insurability approved by the company before he decided on a policy for his wife. He then relates another conversation he had with Carson about the 15th of December (Carson denies that they had any conversation at that time), and says Carson drove over from Greencastle in a car and again urged Salisbury to take an agency for the company, painting in rosy hues the profits which he might earn in that way. He told Carson that he was getting eight hundred dollars a year in teaching school and that he could get twelve hundred dollars away from home. Carson attempted to show him how he could earn enough money in the insurance business to pay his premiums with ease; he told Carson at that time he was not sure he would take his insurance, and Carson says: "How can you take this job?" "I had told him I would have all the insurance I wanted. He says, 'You cannot write life insurance for our company and hold your insurance in another company,' and I told him I would have to tell him 'no.'" He said further to Carson, "Your company is not issuing my policy." Then followed some discussion about the sample that should be sent for examination. Carson at that time, Salisbury says, attempted to show him that he could carry more than ten thousand dollars by taking an agency for the company. The conversation ended by his saying that he would talk it over with his wife and write Carson what he decided. This conversation about December 15th which Salisbury relates and which Carson denies took place shows that he had not abandon-

4—279 Mo.

ed his determination to have two policies in the same company, one for himself and one for his wife; there is nothing there to indicate that the two policies could be separated. At this conversation the prospective agency definitely entered into the consideration, and what he was going to see his wife about was whether he should take the insurance and acquire the agency. He testified that then he decided to take the agency, and begin the first day of May. He says that Carson urged him to go into the life insurance business and he would be able to carry twenty thousand dollars instead of ten. At this time, according to his story, Carson was endeavoring to have him take the one on his wife, whether he succeeded in getting his own policy through or not, showing how he could make an argument to a prospective customer, that he had a policy on his wife, but the company would not write one on him, because he was not a sufficient risk. There was nothing said at that time to indicate that he was willing to accept the policy on his wife's life without one on himself. It is certain that up to that time the minds of the parties had not met on the contract.

Salisbury swore that he definitely accepted the policy by sending in the receipt for it on December 23rd. It will be remembered that when the policy was sent to him on the 20th of November a receipt was enclosed which his wife was to sign for the policy. The receipt was returned December 23rd, with a letter. The argument here is that that was the time when he decided to accept unconditionally the policy on his wife's life, and that letter the means by which he communicated that decision to the company. The letter is as follows:

Green Castle, Mo., Dec. 23, 1914.

Mr. C. M. Carson, St. Louis, Mo.

Friend Carson: Just received your letter to-day and am wondering what is the matter that *we can't get things together.* Dr. Parsons tells me he sent that sample to you as I agreed by phone to have him do. I don't understand this failure.

I am inclosing receipts for the policy already issued and if you will make settlement with the Co. *and let me buy that one and mine, on the terms offered me when you were here, it will be*

*all right with me and we can fix our deal up when you bring my policy to me.*

If you don't get that sample from Parsons very soon I will have Dr. Taylor try his ·hand at it as I want it to go sure, and very much oblige,

Yours very respectfully,

12-28-14  .                                        E. H. SALISBURY.

If Salisbury intended to accept the policy of his wife unconditionally he not only did not say so, but his letter shows that two conditions were still in his mind which must be complied with before it would be accepted. He wondered why "we can't get things together," indicating there was no agreement on anything; this is said in connection with the mention of his efforts to get his own application acceptable. He mentions the enclosed receipt for his wife's policy and speaks of a settlement so that it would let him *"buy that one and mine."* This negatives the idea that he had already bought *"that one"* and shows he still associates the two together, that he did not want *"that one"* without *"mine."* Then he added another condition: *"on the terms offered me when you were here."* That refers to insurance agency. On those two conditions "we can fix our deal up *when you bring my policy to me."* The letter is filled with concern about the tests in his own case, and he hardly could have used language to make clearer his determination to have *two* policies and the agency or none.

On cross-examination Salisbury had this to say about that letter and his intention at the time:

"Q. Now, you declined, did you not, to fix up the deal with him until he brought your policy; I mean the policy issued payable to you as the insured? A. I did not decline that exactly. *We could not very handy arrange an agreement of that kind, because there was a double agreement.* My policy and the settlement was going to be a little different, according to his proposition, and I wanted to wait and have it fixed up right. I wanted to wait until we *found out what was going to become finally of my policy, and then we would know which policy to take."*

This shows conclusively that in his own mind he did not definitely or unconditionally accept his wife's policy when he sent in the receipt.

On December 28th Carson acknowledged the receipt of Salisbury's letter of the 23rd, in a letter as follows:

12-28-14

Mr. E. H. Salisbury,

Green Castle, Mo.

Dear Mr. Salisbury: Yours of Dec. 23—just this date reached me here.

Hustle up and go before Dr. Taylor, as that other sample must have not reached Company. Take prepared meal of Carmel Candy (prepared by Dr. Taylor) & let him send Company sample of urine.

Please hustle this through as I must get this through by Jan. 1st in time for an. report see?

Am glad you have decided on our policies, for we certainly are placing some big cases recently.

(next ad. Keokuk, Iowa.) Regards,

C. M. CARSON.

It is argued by respondent that Carson's expression of pleasure because he had "decided on our policies" is conclusive on the plaintiff that the matter had been closed.

There is no warrant for that inference from the letter. That expression merely indicates that Carson thinks Salisbury has decided that the form of policies in his company are what he wants in preference to policies in other companies, but the conditions on which he would accept the one had not been met. His own must be issued. In that letter Carson is trying to hurry Salisbury with his test, so that he could pass the examination.

On the same day Carson wrote a letter to Mr. Donnelly, assistant secretary of the company, to which he added a post script referring probably to the receipt, saying: "P. S. Please see that *this* & her *husband's policies* are issued at earliest possible moment & mail to me—as this was written in strongest competition and it means other bis. C. M. C." This indicates still that Carson understood that Salisbury would not accept

the policy on his wife's life unless he received one on his own also, and he was trying to get Salisbury's application through.

There was no further conversation or communication between the parties in relation to the matter until after Mrs. Salisbury was shot, December 31st. There is nothing here to show that Salisbury had ever receded from his first intention to have a policy on his own life and on that of his wife in the same company. Carson evidently so understood it.

Salisbury testified quite volubly about the agency matter, about the different propositions which Carson made him with reference to it, and it might be inferred from his testimony of those different conversations that he intended to accept the agency on the terms mentioned by Carson, but it does not appear anywhere that he intended to take the agency on those terms independent of securing both insurance policies.

After his wife was shot it appears to have entered Salisbury's mind that he could afford to carry much more insurance than he had thought himself able to shoulder before that time. He had already concluded his arrangement with the Central Life, and the American Central was so committed that it could not withdraw from the arrangement, and both of these he seems to have cinched. Now he wanted to carry another ten thousand dollars with the plaintiff. His optimism mounted with his wife's declining health. But he never did decide to accept the policy on the life of his wife until after the company had decided to withdraw it, and declared the entire negotiation off. Carson made a visit to Salisbury's home about the 14th of January for the purpose of getting the policy. Both he and Salisbury testified that the conversation was inconclusive. Salisbury offered some excuse; the policy was not there; it was in his trunk and he hadn't the key. By his own testimony he did not definitely declare then that he intended to retain the policy. He did so declare later.

About the 21st of January, Carson attempted to bring the matter to a conclusion with him, but Salisbury refused to talk except in the presence of witnesses. He had employed counsel by that time. Carson also employed an attorney, and they had a conversation in the presence of witnesses, and their respective attorneys on the 27th of January. At that time Salisbury swore he said to Carson: "I told him if he would give me this office and give me this corps of men and give me a 75 per cent accredited contract, five per cent on renewals and ten per cent on the new ones that came through this office, that I would surrender the policy at the end of the year." Carson refused to accept the proposition. Thereupon Salisbury tendered $315, the amount of the first semi-annual premium on his wife's policy, and Carson refused to receive it.

The policy refers to the application as a part of the contract and contains this stipulation: "This policy and the application herefor constitute the entire contract." The application has this clause: "6. That the insurance hereby applied for shall not take effect unless the first premium is paid and the policy delivered to and accepted by me during my lifetime and good health."

This court has held, in the case of State ex rel. v. Robertson, 191 S. W. 989, that inconclusive negotiations, such as this, do not constitute an insurance contract. This court said: "A proposition presented by the one must be accepted by the other in the form tendered; and if the acceptance omits, add to or alters the terms of the proposition made, then neither party to the negotiations is bound. So long as any element of the proposition is left open, the contract is not complete and of course is not binding on anyone," citing several cases.

On the authority of that case it is impossible to conclude that the policy tendered by the company was ever accepted unconditionally during the good health of Mrs. Salisbury, or that the company understood that it was accepted, or acceptable except upon the

condition prescribed by Salisbury, which could not be met.

II. Another reason why the contract was never completed was because the first premium was not paid nor tendered during the good health of Mrs.

Payment of First Premium. Salisbury, as required by the stipulation in the application quoted above.

A stipulation of that character, requiring the payment of a first premium in advance as a condition upon which the policy was to take effect, is always recognized and enforced by the courts. The policy, in such case, is not effective until that condition is complied with. [Kilcullen v. Life Ins. Co., 108 Mo. App. 61; Wallingford v. Home Mut. Fire Ins. Co., 30 Mo. 46; Ormond v. Ins. Co., 96 N. C. 158; Bowen v. Mutual Life Ins. Co., 104 N. W. 1040.]

The respondent claims in this connection that the policy itself recites that payment of the first premium was made, and therefore the appellant could not disprove that recital. It is held, where a policy acknowledges the receipt of the first premium, that such receipt might be disputed for some purposes as any other receipt, but that the payment of the first premium, as recited, could not be disputed for the purpose of invalidating the instrument. It is analagous to the recital of the payment of consideration in a deed; such a recital may be proven by parol to be erroneous, but it is not permitted to show a want of consideration for the purposes of controlling the operative words of the instrument, and thereby defeat it as a contract. [Dobyns v. Bay State Ben. Assn., 144 Mo. 95, 1. c. 109.] That, however, applies to cases where the receipt of the payment is specifically acknowledged. The policy in this case recites as follows:

"Consideration—This insurance is granted in consideration of the application herefor, a copy of whch is attached hereto and made a part hereof, and of the payment in advance of $312.70, being the premium for

the first year's insurance under this policy ending on the 11th day of November, 1915, which is term insurance.''

That recital is not a specific acknowledgment of payment; it merely states what the first payment shall be as consideration for the issuance of the policy. A similar recital in an insurance policy was held by the Kansas City Court of Appeals to be not an acknowledgment of payment. [Dircks v. German Ins. Co., 34 Mo. App. l. c. 41.] There was a like holding by the Springfield Court of Appeals in Lyke v. American National Ins. Co., 187 S. W. 265. The respondent cites the case of Halsey v. Ins. Co., 258 Mo. 659. It is against his contention. The policy in that case was dated May 31, 1906, and purported to go into effect from that date, but the first payment was not paid until June 5th, and it was held that the policy did not go into effect until June 5th.

The policy on the life of Alpha O. Salisbury never went into effect for the reason that the first premium was never paid nor tendered during her good health. It was tendered after she was shot, and when the company was demanding the return of the policy.

There is a suggestion in respondent's brief that the payment of the first premium in advance was waived. On December 22nd, just the day before the letter of Salisbury was written in which he sent in the receipt, Carson wrote to him urging him to try the special diet prescribed for the purpose of making test as to his condition, and said in that letter that he would try and ''get you through,'' adding, ''if not then it will be necessary to either return your wife's policy or remit at least 30 per cent of the premium at once as to go in our annual reports.'' This was a reference to a reduction of the first premium by 70 per cent if he took the agency. It shows the stipulation was not waived. There is no evidence of a waiver.

The judgment in favor of defendant on plaintiff's cause of action and the judgment on the defendant's

counterclaim is reversed, and the cause remanded with directions to the trial court to enter judgment in favor of the plaintiff as prayed in the petition.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.