OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1923.

*(Continued from Vol. 302.)*

LYDIA M. DAYTON, Executrix of Estate of WILLIAM H. DAYTON, Appellant, v. TRAVELERS INSURANCE COMPANY.

Division Two, March 4, 1924.

1. **ACCIDENT INSURANCE:** Contract: Oral Agreement. An oral contract of insurance does not become binding unless the terms of the contract are understood by both parties and agreed to; and if material terms of the policy are neither understood nor discussed, such as the principal sum to be paid for loss of life, the weekly indemnity, the amount of the premium to be paid or the duration of the policy, it cannot be said that a definite proposition was made and accepted as made.

2. ———: Policy Following Oral Agreement: Delivery Upon Condition: Acceptance. The agent of the company, introduced as a witness by plaintiff, testified that he had known deceased for five years, and casually met him on the day on which the application was dated and solicited him for a policy, and deceased agreed to give him one; that he asked him his age and height and other questions relating to his eligibility as a risk, and wrote his answers on the deceased's business card, and took his order for an insurance policy. The agent went to his office, and the next day

Dayton v. Travelers Insurance Company.

wrote a policy for $7,500, filled out an application, made out a bill for 12.50 for the premium, covering a period of six months, and filled out an identification card, and inclosed them all in an envelope, together with a note in which he asked deceased to sign the application blank and return it to him "at once," and then took the envelope to the office of deceased and handed it to a man in charge of the office, and asked him to deliver it to deceased. The man did not deliver the papers to deceased, and there is no evidence that deceased was ever in possession of them. He died eleven days later. The agent testified that on his own initiative, without any information from deceased, he wrote into the application answers to several questions propounded by it, such as, whether deceased contemplated traveling outside of the United States or Canada, whether he ever engaged in motorcycling or aeronautics, whether he owned an automobile, whether any of his relatives had ever been insane or had tuberculosis, whether his habits were temperate, whether he had epilepsy, vertigo or other mental disorders, and whether he agreed that the falsity of any answer shall bar his right to recover if such answer is made with the intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company, and this last question was answered "yes," and the agent testified that, having written such answers to these many questions as he thought deceased would make, he sent him the application "subject to his approval or disapproval." *Held*, that the policy was conditioned on its acceptance by deceased, and as he never had opportunity to accept the conditions the minds of the parties never met, and there was neither oral nor written contract.

3. ——: ——: ——: **Waiver.** An insurance company can waive the signing of a written application by delivering the policy before the application is executed, but where by express terms of the policy the application is made a part of the contract and as such is binding upon the insured, and along with the policy and application goes a note demanding that the application be signed and returned at once by the insured, there is no waiver.

Headnotes 1 and 2: Insurance, 32 C. J. sec. 180. Headnote 3: Insurance, 32 C. J. sec. 190 (1926 Anno).

Appeal from St. Louis City Circuit Court.—*Hon, Benjamin J. Klene, Judge.*

AFFIRMED.

*Bates, Williams & Baron* for appellant.

(1) No delivery was necessary. When the company issued the policy upon Dayton's order, the meeting of minds occurred and the contract of insurance was effected. Baldwin v. Choueau Ins. Co., 56 Mo. 151; Keim v. Home Mutual Fire & Marine Ins. Co., 42 Mo. 38, 41; Edwards v. Business Men's Accident Assn., 205 Mo. App. 102, 108; Pierce v. Insurance Company, 174 Mo. App. 383; State v. Robertson, 191 S. W. 992; 1 Cyc. 239. This case it to be distinguished from the cases where the application and the policy provided that the policy shall not take effect until the written contract of insurance is delivered to the insured. Edwards v. Business Men's Accident Assn., 205 Mo. App. 102, 111. (2) Delivery by the agent Rae of the policy to Jacobs at Dayton's office, with instructions that he deliver the same to Dayton, was a delivery to Dayton. Pierce v. Insurance Co., 174 Mo. App. 383; Appleman v. Appleman, 140 Mo. 309, 313; Peters v. Berkemeier, 184 Mo., 402; Connecticut Indemnity Assn. v. Grogan's Admr., 21 Ky. L. 717; Marysville Merc. Co., v. Home Ins. Co., 21 Idaho, 337, 389; Prosser Power Co. v. United States Fid. & Guar. Co., 73 Wash. 304. (3) Non-delivery is an affirmative defense and the burden of proof thereof is on the defendant. Lafferty's Admx. v. Casualty Co., 287 Mo. 555; Prindle v. Fidelity & Casualty Co., 233 S. W. 255. (4) The defendant is estopped from claiming that the policy is not in force because of the provision contained in the policy, and by the fact that at the time of the delivery of the policy it sent a bill for the premium to its agent, and at the time the agent delivered the policy to Dayton he also delivered the bill for the premium, and by the identification card which state that Dayton was insured under the policy. Prindle v. Fidelity & Cas. Co., 233 S. W. 255; Berryman v. Southern Surety Co., 285 Mo. 379, 393; Fowler v. Surety Co., 88 Kan. 455; Weber v. Ancient Order of Pyramids, 104 Mo. App. 729, 732; Wells v. Metropolitan Life

Ins. Co., 19 App. Div. 18, 163 N. Y. 572; Prosser Power Co. v. United States Fid. & Guar. Co., 73 Wash. 304. (5) The court erred in giving the instruction whereby the jury was instructed that though they find that the application and policy came into the possession of Dayton they must in addition find that in some manner after coming into the possession of the policy and application Dayton must have communicated his acceptance of the policy on the terms set forth in the application to the defendant. Cases supra. (6) Dayton did not have to communicate his acceptance of the policy on the terms set forth in the application or sign and return the application. Prindle v. Fidelity & Cas. Co., 233 S. W. 252; Insurance Company v. Webster, 6 Wall. 129. (7) The representations inserted in the application appended to the policy not upon information given by Dayton, but resulting from the assumptions of the agent, could not in any way affect the policy. Those statements are the statements of the insurer and the insurer is estopped to claim them as warranties. Ormsby v. Insurance Co., 105 Mo. App. 143; Combs v. Hannibal Savings & Ins. Co., 43 Mo. 148; Ayres v. Insurance Co., 66 Mo. App. 288; Pearl Life Assurance Company v. Johnson, 2 King's Bench Law Rep. (1909) 288; Pearl Life Assurance Co. v. Greenhalgh, 2 King's Bench Law Rep. (1909) 288; Wells v. Metropolitan L. Ins. Co., 19 App. Div. 18, 46 N. Y. Supp. 80, 163 N. Y. 572. (8) When the company accepted Dayton as a risk, they accepted him according to his application and the representations made at the time. The formal application was not necessary. Beswick v. National Casuality Co. 206 Mo. App. 67, 73. (d) The insured has the right to rely on the presumption that the policy is issued in accordance with his application and is not obliged to read it to see that it conforms therewith. German-American Ins. Co. v. Darrin, 80 Kan. 578, 581; McElroy v. British Amer. Assur. Co., 94 Fed. 990, 1000, 36 C. C. A. 615. (10) Dayton was not obliged to pay the premium on the policy, since credit was extended to him. Edwards v. Business Men's Accident Assn., 205 Mo. App. 102, 1047; Berryman v. Southern Surety Co.,

285 Mo. 379, 393.  (11) The court should have admitted the policy in evidence exclusive of the written application appended thereto.

*Jones, Hocker, Sullivan & Angert* for respondent.

(1) The negotiations had never reached the point of a complete contract of insurance.  State ex rel. v. Robertson, 191 S. W. 991; Insurance Co. v. Salisbury, 279 Mo. 54; Lungstras v. Insurance Co., 48 Mo. 204, 69 Am. St. 143, note; Horton v. Insurance Co., 151 Mo. 619; Myers v. Insurance Co., 27 Pa. St. 268; Perry v. Insurance Co., 67 N. H. 291; Payne v. Insurance Co., 51 Fed. 693; Equitable Life Assurance Co. v. McElroy, 83 Fed. 642; Milwaukee Insurance Co. v. Graham, 181 Ill. 158; Busher v. N. Y. Life Ins. Co., 72 N. H. 551; 32 C. J. 1103; Providence Savings Life Association v. Elliott, 93 S. W. 659; New v. Insurance Co., 171 Ind. 33; Lucas v. Western Union Telegraph Co., 6 L. R. A. (N. S.) 1016; Scottish American Mortgage Co. v. Davis, 96 Tex. 104; Bowman v. Accident Company, 124 Mo. App. 481.  (2) There is no estoppel. Taylor v. Zepp, 14 Mo. 482; Pollard v. Ward, 233 S. W. 17.

WHITE, J.—The plaintiff, as executrix of the estate of her deceased husband, William H. Dayton, brought this suit against the defendant on an accident insurance policy, whereby the defendant insured the life of said William H. Dayton in the sum of $7500 "against loss resulting from bodily injuries, effected directly and independently of all other causes through external, violent and accidental means."  On a trial in the Circuit Court of the City of St. Louis, March 23, 1922, a jury returned a verdict for the defendant, and the plaintiff appealed.

The evidence shows that William H. Dayton, January 6, 1920, had a conversation with E. D. Rae, district agent for the Travelers Insurance Company, regarding a policy in the said company.  Rae went to his office and the next day wrote a policy for $7500, filled out an ap-

.lication, made out a bill for $12.50, for the premium, covering a period of six months, filled out an identification card, enclosed them all in an envolope, including a note to Dayton asking him to sign and return the application blank, took the envelope containing all those papers to Dayton's office and handed them to a Mr. Jacobs in charge of the office, asking him to deliver them to Dayton. Rae did not see Dayton then, nor have any communication with him after that. There was no evidence that Dayton ever got possession of the policy or other papers. The particular facts in relation to that will be noticed more fully below. Jacobs never delivered them to Dayton. An important question is presented as to whether the minds of the parties ever met upon a contract.

Dayton died January 17th, eleven days after his conversation with Rae. The evidence showed that, with some companions at the Statler Hotel, he had been drinking heavily for several days before his death, and was drunk at least a part of that time. The expert evidence is conflicting as to the cause of his death. The plaintiff introduced expert evidence to show that his death was caused by wood-alcohol poisoning; the defendant's expert evidence tended to show that he died from alcoholism. The significance of these particulars is in the claim that if he died from the effects of wood alcohol the death was accidental, because he could not have intended to take it; whereas, if he died from alcoholism it was not accidental, but the result of his intentional debauch.

There was evidence also to show that Dayton had been drunk on previous occasions at different times. He was fifty-six years of age at the time of his death.

Two principal issues were presented to the jury: One, regarding the facts which would determine whether there was a contract; the other, relating to the cause of death. A great many errors are assigned by appellant in the instruction given by the court on both these principal issues.

I. The first question presented is whether there was a contract. As stated, Rae, the agent, and Dayton, the

applicant, had a preliminary talk January 6th, in relation to the proposed insurance. Later, in pursuance of that conversation the agent filled out a policy, an application, an identification card, and with a letter, took them to be delivered to Dayton, with no further communication between the two. These two transactions are what is presented by the record for determining this point. We must determine whether either of these, or both together, resulted in a contract.

It is the claim of the appellant that a contract ensued from that first conversation. It is thus stated in appellant's brief:

"When respondent's agent, Rae, solicited Dayton for an accident insurance policy and Dayton ordered an accident insurance policy from Rae, and Rae, who had authority to countersign policies, agreed to give him one, the contract of insurance was effected, particularly so when Rae's action was subsequently ratified by the issuance of a policy by the respondent, countersigned by Rae."

This is reiterated later, as follows:

"We repeat that when respondent's agent agreed to issue a policy unto Dayton, upon Dayton's oral offer to take one, the contract was consummated."

Rae was introduced as a witness for the plaintiff. His testimony is all there is regarding that conversation. He said:

"I knew Mr. Dayton for a period of five to ten years. I took his order for an insurance policy. He gave me one of his business cards, and I asked a lot of data from him and wrote it on there myself. His name was on the card. I asked him his age and his height."

On cross-examination the witness stated the interview this way:

"I saw Mr. Dayton on the same day on which the application is dated, to-wit, January 6, 1920. I met him casually and it was not convenient at the time to sit down and write an application. I solicited him for a policy and agreed to give him one. Then he gave me one of his cards. It showed his business, Missouri Iron & Steel Cor-

poration, and I wrote down certain information on that card.''

The witness in one place stated that he asked and Dayton answered some questions, about his age, height, etc., but nothing further is mentioned in his testimony as to anything said by him or by Dayton indicating a contract at that preliminary conversation. Does it measure up to the assertion of the appellant that by that means ''the contract was consummated?''

No doubt the books are full of instances where an insurance contract dates from the date of application for the same, and where it is held that an oral contract of insurance may be entered into and become binding, although afterwards reduced to writing. In all such cases the *terms* of the contract were understood by both the parties; for instance, the case relied upon by the appellant on this proposition, Edwards v. Business Men's Accident Association of America, 205 Mo. App. 102, opinion written by STURGIS, J., who said, at page 109:

''Contracts are generally consummated when a definite proposition is made and accepted as made, and in insurance law the rule is that 'on the acceptance of the application the contract is consummated.' Delivery of the written policy, though such is contemplated by the parties, is not essential unless made so by the contract.''

Also the case of Baldwin v. Chouteau Ins. Co., 56 Mo. l. c. 154, where this is said:

''The agreement may exist and be complete prior to drawing up and delivering the policy, and courts will interpose and furnish relief when the negotiations have reached such a point that nothing remains to be done by either party but to execute what has been agreed upon.''

What is there in this preliminary conversation to bring it within the rule announced in either of those cases? How can it be said that, *''a definite proposition is made and accepted as made,''* as required in the Edwards Case? Or that, ''the negotiations have reached such a point that nothing remains to be done by either party *but to execute what has been agreed upon.''*

What was agreed upon in this case?   The policy sued upon stated a principal sum of $7500 for loss of life. The application mentioned $25 weekly, for accident. The premium was $12.50 for six months.   In that conversation not a syllable was uttered by either of the parties indicating that any of those amounts were agreed upon, or that there was any understanding whatever as to the principal sum of the policy, the weekly payment for accident, or that the defendant sold only policies of those definite sums.   Not a word was said about the amount of premium to be paid.   Let it be assumed that in a casual conversation of this kind the party desiring the insurance understands in a general way what the terms of the policy will contain.   That by no means contains *all the* terms of the contract.   The amount to be paid on death or disability, the duration and the cost of the policy, are terms which must be understood before there is a contract.   In the record the copy of the policy does not show what was written in, nor what was in the printed form, assuming that the printed form, with all of its provisions, was understood by the insured.   In the absence of any evidence we will not assume that the amount of the life risk, the disability risk, nor the amount of the premium, was printed in the form.   Hence, at that preliminary conversation the minds of the parties did not meet on certain terms of the alleged contract.

It should also be said in this connection that the plaintiff did not sue on the oral application and acceptance, as a completed contract, nor as a part of the consummated contract.   The suit clearly is on the face of the policy as it is written.

II. Now let us see if the writing which followed the conversation continued the negotiations to the point where the minds of the parties met.

Acceptance.

Rae testified that he asked questions about the age, height, and other matters relating to Dayton's eligibility as a risk, and then went to his office and filled out a written application, part of it from what Dayton had told him and part of it from what he thought Dayton would

answer. Among the answers which he wrote in the application on his own initiative, without any information from Dayton, were whether or not Dayton contemplated traveling or living outside of the United States or Canada, or whether he ever engaged in motorcycling, or in aeronautics; whether he owned an automobile; whether any of his relatives ever had been insane, or had tuberculosis; whether his habits were temperate; whether he had epilepsy, syphilis, vertigo, etc., tuberculosis, mental disorders, etc., whether during the last ten days he had been exposed to any contagious or infectious disease; and this important question:

"S. Do you agree that the falsity of any answer in this application for a policy shall bar the right to recover thereunder if such answer is made with intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company? Yes."

Dayton never answered those questions nor signed that condition, but application was enclosed with the policy and left at Dayton's office with Mr. Jacobs, with instructions to deliver to Dayton, with this letter:

"E. D. Rae
"Third National Bank Bldg.
"St. Louis.
"Dear Billie:
"Please sign this application blank and return to me at once please and oblige yrs,

"E. D. RAE"

Notice that "at once" is in black-face type, and doubtless was underscored in that letter. Rae further swore of the application:

"There were several other questions answered that were answered by me, and the information wasn't given by Mr. Dayton. I thought the answers probably would be those that Mr. Dayton would make and *I sent it to him subject to his approval or disapproval.*"

Where had the minds of the parties met? Was the delivery of the policy accompanying this application unconditional? If so, why the "at once" in the letter demanding that the application be signed and returned?

And why in Rae's mind the necessity of "approval or disapproval?" That demand in the letter was because Mr. Rae did not regard the contract as conclusive until certain conditions were complied with. The only way that Dayton could approve the conditions on which the policy was to be retained by him as a completed contract was to indicate in some way that he was bound by the conditions in the application. Could the agent more definitely have said to him that the delivery of the policy was conditioned on its acceptance by his signing "at once" the application which Rae regarded was sent to him "for his approval or disapproval."

Two important cases upon that subject have been decided by this court: State ex rel. v. Robertson, 191 S. W. 989, where an application was signed and sent on to the company. A policy was written in pursuance of it and mailed by the company to its general agent for delivery. The only difference between the application and the terms of the policy as written was that on examination the company found certain phases of the applicant's physical condition which caused them to "rate him up" of an age five years older than he was, so that his premium was slightly increased. The applicant died before the agent delivered the policy to him; the company refused to deliver it. The first premium was paid and accepted; the company was ready to deliver the policy, and would have delivered it, if the applicant had not died before it reached him. It required only his acceptance; there were no conditions of delivery; it was assumed that the slight variation in the future premiums would be satisfactory to him. It was held the minds of the parties did not meet.

The case of Insurance Company v. Salisbury, 279 Mo. 40, is where a policy was delivered for the purpose of inspection and comparison with policies submitted by other companies. The insured claimed that the policy was delivered. That issue of fact was found in his favor by a jury, but this court reversed the judgment on the ground that in the negotiations between the parties, which negotiations were at great length, the minds of the parties never met on all the terms of the arrange-

ments; that certain conditions in the mind of the insured must be met before it could be held that he accepted the policy.

The significance of these two cases is that in each case the delivery of the policy by the company did not conclude the contract, because in each case there was a condition, implied from the circumstances, which must be complied with before delivery was absolute. The evidence in this case shows that Rae took the policy, the application, the identification card which he made out, the letter, and handed them all in an envelope to Mr. Jacobs at Dayton's office, telling him to deliver it to Dayton. Jacobs never delivered it to Dayton. There was no evidence whatever that the papers ever came into Dayton's hands. After Dayton's death Jacobs delivered them to some one representing his estate. There was no indication that Dayton ever had opportunity to accept the policy, or to understand for how much, or on what terms it purported to insure him, or the conditions upon which it was submitted to him. We say "conditions" because it is impossible to interpret this transaction in any other way than that the policy was sent to him upon condition that he became bound by the statements in the application.

III. It is said, however, that the company could waive the signing of the written application by the insured by delivering the policy before it was executed. No doubt the company could have done so, but it did not waive it; through its agent, Rae, it demanded its execution and return *at once*. Dayton could not possibly have understood from that communication, if he had received it, that he had a right to retain the policy without signing and returning the application. By express terms the policy provided that the application be made a part of the contract, and as such binding upon the insured.

Waiver.

The facts disclosed clearly show that the minds of the parties never met on any contract which would support a cause of action.

The judgment, accordingly, is affirmed. All concur.